1

**COMP**
**MATTHEW Q. CALLISTER, ESQ.**
Nevada Bar No. 001396

2

mqc@call-law.com
**CALLISTER & ASSOCIATES**

3

823 Las Vegas Blvd. South
Las Vegas, Nevada 89101

4

Telephone: (702) 385-3343
Facsimile: (702) 385-2899

5

*Attorneys for Plaintiffs*

6

7                    **UNITED STATES DISTRICT COURT**

8                           **DISTRICT OF NEVADA**

9

DENNIS ARDINE; CELSA ARENAS;
PATRICE ARMBRISTER; ROBERT

10

BAKER JR.; LEIGH BLACKWELL;
RICHARD BOHLKE; THOMAS CROOKS;

11

DAVE CROSS; JOAN CROSS; PAMELA
FRICKX; LESLIE HUMPHREY;

12

MAHVASH JAHANGIRI; MOHAMAD
JAHANGIRI; ROBERT JOHNSON; JAMES

13

KIRKPATRICK; LORETTA
KIRKPATRICK; LEONARD PASCUAL;

14

LARAE ROLLYSON; RICHARD SHELER;
SYLVIA THOMPSON-SHELER; MARY

15

JOE STOGLIN; and JOSEPH VERONA;

16

                          Plaintiffs,

17

v.

18

BANK OF AMERICA CORPORATION;

19

BANK OF AMERICA, NATIONAL
ASSOCIATION; BAC HOME LOANS

20

SERVICING, LP; RECONTRUST
COMPANY, NA.;

21

                          Defendants.

22

AND ALL RELATED MATTERS

23

Case No.:

**CLASS ACTION COMPLAINT**

1. Breach of Contract / Breach of Covenant
   of Good Faith and Fair Dealing
2. Promissory Estoppel
3. Violations of the Nevada Deceptive Trade
   Practices Act

24          COMES NOW, Plaintiff Class Representatives, DENNIS ARDINE, CELSA ARENAS,

25   PATRICE ARMBRISTER, ROBERT BAKER JR., LEIGH BLACKWELL, RICHARD

26   BOHLKE, THOMAS CROOKS, DAVE CROSS, JOAN CROSS, PAMELA FRICKX, LESLIE

27   HUMPHREY, MAHVASH JAHANGIRI, MOHAMAD JAHANGIRI, ROBERT JOHNSON,

28   JAMES KIRKPATRICK, LORETTA KIRKPATRICK, LEONARD PASCUAL, LARAE

ROLLYSON, RICHARD SHELER, SYLVIA THOMPSON-SHELER, MARY JOE STOGLIN, and JOSEPH VERONA, by and through their attorneys, the law firm of Callister + Associates, LLC, and hereby files this Class Action Complaint against the above named Defendants as follows:

## PARTIES AND JURISDICTION

1. That at all times hereinafter mentioned, Plaintiff DENNIS ARDINE was and still at all times is a resident of Clark County, Nevada.

2. That at all times hereinafter mentioned, Plaintiff CELSA ARENAS was and still at all times is a resident of Clark County, Nevada.

3. That at all times hereinafter mentioned, Plaintiff PATRICE ARMBRISTER was and still at all times is a resident of Clark County, Nevada.

4. That at all times hereinafter mentioned, Plaintiff ROBERT BAKER JR. was and still at all times is a resident of Nye County, Nevada.

5. That at all times hereinafter mentioned, Plaintiff LEIGH BLACKWELL was and still at all times is a resident of Nye County, Nevada.

6. That at all times hereinafter mentioned, Plaintiff RICHARD BOHLKE was and still at all times is a resident of Nye County, Nevada.

7. That at all times hereinafter mentioned, Plaintiff THOMAS CROOKS was and still at all times is a resident of Nye County, Nevada.

8. That at all times hereinafter mentioned, Plaintiff DAVE CROSS was and still at all times is a resident of Clark County, Nevada.

9. That at all times hereinafter mentioned, Plaintiff JOAN CROSS was and still at all times is a resident of Clark County, Nevada.

10. That at all times hereinafter mentioned, Plaintiff PAMELA FRICKX was and still at all times is a resident of Clark County, Nevada.

11. That at all times hereinafter mentioned, Plaintiff LESLIE HUMPHREY was and still at all times is a resident of Clark County, Nevada.

12.  That at all times hereinafter mentioned, Plaintiff MAHVASH JAHANGIRI was and still at all times is a resident of Clark County, Nevada.

13.  That at all times hereinafter mentioned, Plaintiff MOHAMAD JAHANGIRI was and still at all times is a resident of Clark County, Nevada.

14.  That at all times hereinafter mentioned, Plaintiff ROBERT JOHNSON was and still at all times is a resident of Clark County, Nevada.

15.  That at all times hereinafter mentioned, Plaintiff JAMES KIRKPATRICK was and still at all times is a resident of Clark County, Nevada.

16.  That at all times hereinafter mentioned, Plaintiff LORETTA KIRKPATRICK was and still at all times is a resident of Clark County, Nevada.

17.  That at all times hereinafter mentioned, Plaintiff LEONARD PASCUAL was and still at all times is a resident of Clark County, Nevada.

18.  That at all times hereinafter mentioned, Plaintiff LARAE ROLLYSON was and still at all times is a resident of Clark County, Nevada.

19.  That at all times hereinafter mentioned, Plaintiff RICHARD SHELER was and still at all times is a resident of Clark County, Nevada.

20.  That at all times hereinafter mentioned, Plaintiff SYLVIA THOMPSON-SHELER was and still at all times is a resident of Clark County, Nevada.

21.  That at all times hereinafter mentioned, Plaintiff MARY JOE STOGLIN was and still at all times is a resident of Clark County, Nevada.

22.  That at all times hereinafter mentioned, Plaintiff JOSEPH VERONA was and still at all times is a resident of Clark County, Nevada.

23.  Defendant Bank of America Corporation is a foreign corporation that is incorporated in Delaware, with its principal place of business located in Charlotte, North Carolina.  At all times material to this Complaint, Bank of America was doing business in the State of Nevada.  Bank of America Corporation is the parent corporation of Bank of America, National Association.

24. Defendant Bank of America, National Association (N.A.) is a national bank with its principal place of business located in Charlotte, North Carolina. At all times material to this Complaint, Bank of America, N.A. was doing business in the State of Nevada. Bank of America NA is the parent of BAC Home Loans Servicing, LP and ReconTrust, N.A.

25. Defendant BAC Home Loans Servicing, LP services loans and is a subsidiary of Bank of America with its principal place of business located in Texas. At all times material to this Complaint, BAC Home Loans Servicing, LP was doing business in the State of Nevada.

26. Defendant ReconTrust Company, NA. is a wholly-owned subsidiary of Bank of America, NA. that services defaulted mortgages. At all times material hereto, ReconTrust's principal place of business was located in California, and ReconTrust was doing business in the State of Nevada.

27. On July 1, 2008, Bank of America completed its purchase of Countrywide Financial Corporation ("Countrywide"). Since the acquisition, Bank of America has taken over servicing loans previously serviced by Countrywide. In addition to the Countrywide loans, Bank of America also services loans for other mortgage investors and loans it originated.

## FACTS

28. Plaintiffs bring this class action on behalf of themselves, and similarly-situated individuals as described in the paragraphs set forth herein. This Complaint challenges the failure of Defendants Bank of America Corporation and Bank of America Bank, N.A. acting independently and through its subsidiary Defendant BAC Home Loans Servicing, LP (referred to jointly as "BOA" where not otherwise described in their individual capacities) to honor both the terms of their agreement with the United States Treasury for the intended benefit of homeowners, as well as their failure to honor agreements directly with individual homeowners to modify mortgages and thereby to prevent unnecessary

foreclosures.

29. Plaintiffs' claims are simple - when a financial institution enters into a contract in which it promises to modify a loan and prevent an unnecessary foreclosure, homeowners expect that promise to be kept. This is especially true when the financial institution has entered into, and accepted benefits from a federal program specifically targeted at preventing foreclosure and allowing certain homeowners to maintain ownership of their homes.

30. In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds along with a partial guarantee against losses on $118 billion in mortgage-related assets. By accepting this payment, Bank of America agreed that it would participate in one or more programs that TARP authorized the Secretary of the Treasury to establish necessary to minimize foreclosures.

31. Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") - a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers. Companies that accepted money under TARP are subject to mandatory inclusion in HAMP as are certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

32. Bank of America signed a Servicer Participation Agreement ("SPA") with the U.S. Treasury on April 17, 2009 (attached as **Exhibit 1** and incorporated by reference) agreeing in its capacity as loan servicer to comply with HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines. The guidelines issued by the Treasury Department set forth a detailed process whereby a participating servicer such as Bank of America, acting through its subsidiary BAC Home Loans Servicing, must:

- identify loans that are subject to modification under the HAMP program, both through its own review and in response to requests for modification from individual homeowners;

- collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;

- institute a modified loan with a reduced payment amount as per a mandated formula, that is effective for a three-month trial period for borrowers that are eligible for a modification; and

- provide a permanently modified loan to those homeowners who comply with the requirements during the trial period. Whether the homeowner qualifies for a modification or not, participating servicers are also required to provide written notices to every mortgage borrower that has been evaluated for a loan modification, whether or not the borrower has been found eligible.

33. HAMP and its associated directives also set prohibitions against certain conduct including instituting or continuing foreclosure proceedings while a borrower is being evaluated for a loan modification, and restrictions on the way a servicer may report the borrower to credit reporting agencies.

34. Though Bank of America accepted $25 billion in TARP funds and entered into a contract obligating itself to comply with the HAMP directives and to extend loan modifications for the benefit of distressed homeowners, Bank of America has systematically failed to comply with the terms of the HAMP directives and has regularly and repeatedly violated several of its prohibitions.

35. Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification. However,

this incentive is countered by a number of financial factors that make it more profitable for a mortgage servicer such as BOA to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by BOA because BOA does not carry a significant risk of loss in the event of foreclosure. On information and belief, BOA does not own a significant majority of the loans on which it functions as servicer.

36. Economic factors that discourage BOA from meeting its obligations under HAMP by facilitating loan modifications include the following:

- BOA may be required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

- The monthly service fee that BOA, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

- Fees that BOA charges borrowers that are in default constitute a significant source of revenue to it. Aside from income BOA directly receives, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather

than a foreclosure, is often less clear and less generous.

- Fixed overhead costs involved in successfully performing loan modifications involve up-front costs to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

37. Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, BOA has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States. BOA's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by BOA, who are eligible for permanent loan modifications, and who have met the requirements for participation in HAMP, have not received permanent loan modifications to which they are entitled.

38. In addition to its obligations based on its contract with the Treasury Department, as a participating servicer in HAMP, BOA entered into a standardized contract with Plaintiffs and thousands of homeowners for a temporary trial modification of their existing note and mortgage. Each such modification agreement promises that if the borrower complies with the terms of the temporary modification agreement and the borrower's representations on which the offer of a modification was based continue to be true in all material respects, then the borrower will receive a permanent modification on the same terms. The contract, known as a "Trial Period Plan" ("TPP") Agreement, is for a finite time period - normally three months -and specifies that "TIME IS OF THE ESSENCE." The Trial Period Plan ("TPP") Classes, defined below, made the required payments under their TPP Agreements and expected to receive either a final modification or a denial of eligibility before the end of the trial period. Neither was forthcoming. Despite Plaintiffs' efforts, BOA has ignored its contractual obligation to modify their loans permanently.

39. Because BOA is not meeting its contractual obligations, hundreds of thousands of

homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes. By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts it formed with individual homeowners, BOA has left thousands of borrowers in a state of limbo - often worse off than they were before they sought a modification from BOA. Defendants' actions violate their contractual obligations, thwart the purpose of HAMP, and are unfair and deceptive under state laws.

### The Foreclosure Crisis

40. Over the last three years, the United States has been in a foreclosure crisis. In late 2009, a congressional oversight panel noted that one in eight U.S. mortgages was in foreclosure or default.

41. For the third quarter of 2010, foreclosure filings-default notices, scheduled auctions and bank repossessions were reported on 930,437 properties in the 3rd quarter. One in every 139 U.S. housing units received a foreclosure filing in this quarter.

42. Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

43. The foreclosure crisis is not over. Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011. *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis,* Working Paper No. 573.2 at 9, Figure 30, (citing a Credit Suisse study showing monthly mortgage rate resets).

### Creation of the Home Affordable Modification Program

44. Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C. § 5201 et seq. (2009).

45. The purpose of the Act is to grant the Secretary of the Treasury the authority to restore

liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." **Id.**

46. The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. **Id.**

47. Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

48. In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

49. The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." **Id.**

50. The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C. § 5220.

51. On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

52. The Making Home Affordable program consists of two subprograms. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

53. The second sub-program relates to the creation and implementation of a uniform loan

modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.  It is this subprogram that is at issue in this case.

54.  HAMP is funded by the federal government, primarily with TARP funds.  The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

### Duties of a Participating Servicer Under HAMP

55.  Because Bank of America accepted $25 billion in federal funds and additional loan guarantees, it was required to participate in HAMP for the loans on which it functions as a loan "servicer."  On April 17, 2009, Steve R. Bailey, of Bank of America, N.A., executed a SPA with the federal government.  **See Exhibit 1 attached hereto.**

56.  As a Congressional Oversight Panel evaluating HAMP noted, "[p]articipation in the program by servicers is voluntary, but once a servicer elects to participate, adherence to the program standards is mandatory for all the servicer's loans."  Congressional Oversight Panel, December 14, 2010 report at 4 (hereinafter December 14 Report).

57.  The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation," **see SPA § 1.A,** and are incorporated by reference herein.  The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."  **SPA §§ 1.A., 2.A.7**

58.  The first Supplemental Directive ("SD") was issued on April 6, 2009, and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners - both those who are in default and those who are at imminent risk of default - by reducing monthly payments to sustainable levels." **SD 09-01 (Exhibit 2)  at 1.**  This directive and the directives to follow were issued to provide guidance for

adoption and implementation of HAMP "to provide a borrower with sustainable monthly payments." **Id.**

59. The Program Documentation requires Participating Servicers to evaluate all loans that are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria. **SD 09-01 (Exhibit 2) at 4.** In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification. **Id. at pp. 3-4.**

60. A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP") agreement.  Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.

61. A mortgage is eligible for HAMP if threshold criteria enumerated in the Program Documentation are met.  Aside from criteria that require the loan to be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

62. Each and every one of the Plaintiffs made an application that included personal financial information, tax information, and a statement attesting to their hardship.

63. Once the participating servicer has determined a borrower meets HAMP's threshold requirements, based on both information already in its possession and information submitted by the applicant homeowner, the servicer must then determine if the borrower is eligible to receive a HAMP modification, the goal of which is to modify the terms of the loan such that for the first five years, the monthly mortgage payment is equal to 31

percent of the borrower's income.

64. The servicer does this by applying the steps enumerated in the Program Documentation to the loan, in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income.  This process is known as the "waterfall."  These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary).  **See SD 09-01 (Exhibit 2) at 8-10; see also Exhibit 3 at 2.**  BOA does not have discretion as to how this formula is applied - HAMP rules require servicers to take these enumerated steps in the prescribed order until the target monthly mortgage payment equaling 31% of monthly income is reached.

65. If application of the steps in the Program Documentation yields terms that produce the target 31% monthly mortgage payment, the servicer must offer the borrower a TPP Agreement if the modification provides a net present benefit to the mortgage holder.  This determination is known as the "Net Present Value" or ("NPV") test and is to be performed prior to the tender of a TPP Agreement.

66. The TPP Agreement describes a three or four month trial period in which the homeowner makes mortgage payments based on the modification formula stated in the Program Documentation.  BOA uses a standard form agreement to offer TPP Agreements to eligible homeowners.  One such example of a form TPP Agreement is attached hereto as **Exhibit 6.**  This agreement describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

67. The very first sentence of the form TPP Agreement used by BOA states: "If I am in compliance with this Trial Period Plan (the 'Plan') and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in

Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

68.   Section 3 of the form TPP Agreement repeats this promise:  "If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Servicer will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date."

69.   Further, the form TPP Agreement defines a finite "trial period" (usually three months but in some cases, four months), states that "TIME IS OF THE ESSENCE" and identifies the "modification effective date" as the first day of the month following the month in which the final trial payment is due.

70.   If the homeowner executes the TPP Agreement, complies with all documentation requirements verifying the information on which the initial finding of eligibility was made and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner must be offered a permanent modification.  The payment amount and interest rate in the modified loan are fixed for five years and equal to the payment amount and interest rate in the TPP.  Thereafter, the rate may escalate annually by up to one percent until it reaches an interest cap which is the lesser of:  (i) the fully indexed and fully amortizing contract rate or (ii) the Freddie Mac Primary Mortgage market Survey rate for 30-year fixed rate mortgage loans on the date the modification is prepared.  Once capped, the rate is fixed for the remainder of the term.  **See SD 09-01 (Exhibit 2) at 9.**

71.   The TPP Agreement requires homeowners to undertake several duties that they are not otherwise obligated to undertake.  Section 1 of the TPP Agreement required the homeowner to agree to undergo credit counseling, if they were asked to do so.  In addition, the TPP Agreement requires homeowners to submit financial documentation that they were not otherwise required to provide, to set up newly established escrow

accounts, and to make legally binding representations about their personal circumstances.

72.  Subject to adjustments that can be made to account for documented and verified changes in circumstances, HAMP directs that the terms of the Trial Plan are automatically made permanent upon a homeowner's successful completion of the Plan.  SD 09-01 states that "[i]f the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period as specified in the Trial Period Plan." **Ex. 2 at p. 18.**

### BOA has Failed to Meet its HAMP Obligations as Promised under the SPA

73.  By entering into the SPA, Bank of America covenanted that all services will be performed in compliance with all applicable federal, state and local laws, specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices. **SPA, Ex. 1 at  5(b).**

74.  Under the SPA, Bank of America also covenanted that it would perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well managed operation, and no less than which Bank of America exercises for itself under similar circumstances, and that Bank of America would use qualified individuals with suitable training, education, experience and skills to perform the Services. **Id. at  5(d).**

75.  Bank of America has routinely failed to meet its obligations under HAMP. Mortgage borrowers who request to be evaluated for a modification under HAMP routinely face unexplained delays and go weeks or months with no communication from BOA after providing the requested information.  Borrowers who attempt to contact BOA by telephone face long periods of time on hold and are transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call.  BOA regularly falsely informs borrowers that it did not receive requested information and demands that documents be re-sent.

76.  Further, Program Documentation includes an entire set of notice requirements that BOA

routinely ignores, including the provision of clear explanations when a homeowner is denied participation in HAMP, as evidenced by the individual allegations set forth below. HAMP requires a participating servicer to send a Borrower Notice to every homeowner that has been evaluated for HAMP but is not offered a Trial Period Plan, is not offered an official HAMP modification, or is at risk of losing eligibility for HAMP because they have failed to provide required financial documentation. **SD 09-08 (Ex. 5) at p. 1.**

77. In addition, BOA's conduct has run afoul of the following prohibitions in HAMP rules, as evidenced by the individual allegations set forth below:

- Proceeding with a foreclosure sale. Any foreclosure sale must be suspended and no new foreclosure action may be initiated during the trial period, and until the borrower has been considered and found ineligible for other available foreclosure prevention options. **See Ex. 4 at Q63; see also SD 09-01 (Ex. 2) at p. 14.**

- Requiring borrowers to make an initial contribution payment pending the processing of the trial period plan before the plan starts. **Ex. 4 at Q. 83.**

- Soliciting borrowers to opt out of consideration for HAMP during the temporary review period. **Ex. 7 at Q1230-02.**

- Reporting borrowers as delinquent to credit reporting bureaus without explanation. For borrowers who are current when they enter a trial period, the servicer should report the borrower current but on modified payment if the borrower makes timely payments during the trial period. For borrowers who are delinquent when they enter the trial period, the servicer should report in such a manner that accurately reflects the borrower's current workout status. **SD 09-01 Ex. 2 at p. 22.**

- Assessing prepayment penalties for full or partial prepayment as part of the modification. **Ex. 4 at Q. 25.**

78. Former BOA employees have confirmed that BOA is not complying with HAMP in a

manner that can only be considered deliberate. BOA's general practice and culture is to string homeowners along with no intention of providing actual and permanent modifications. Instead, BOA has put processes in place that are designed to foster delay, mislead homeowners and avoid modifying mortgage loans.

79. One former employee described BOA commonly encouraging or even requiring homeowners to resubmit financial information each time the customer called in to inquire about a pending modification. Any change in financial information - even a small change - then causes BOA to restart the application process under the pretext of changed factual information.

80. BOA customer service representatives are instructed to mislead homeowners who call to inquire about loan modifications for which they have applied. According to former employees, customer service representatives regularly inform homeowners that modification documents were not received on time or not received at all when, in fact, all documents have been received. Similarly, homeowners are regularly told that documents were sent on a particular date when, in fact, BOA had not sent the documents at all. With few exceptions, the named plaintiffs in these matters were subjected to redundant, ambiguous and threatening demands for documents by BOA- documents that had already been submitted, that were not required to determine eligibility under HAMP guidelines, or that were unnecessary "updates" of previous documents.

81. A former BOA employee has confirmed that BOA regularly ignores completed loan modifications by not properly reflecting the modification in its computer system. BOA continues to treat the loan as delinquent by sending delinquency notices, reporting homeowners as delinquent to credit reporting agencies, and by instituting foreclosure proceedings.

82. A former employee has confirmed that BOA regularly fails to properly credit payments homeowners make under a TPP Agreement. BOA commonly applies payments to late fees or foreclosure fees and then deems a payment the homeowner made under a trial

plan to be insufficient.  BOA's regular practice is to place payments a homeowner makes into a suspense account or "partial payment balance account" and not to credit the homeowner's regular mortgage account.  This results in BOA treating a homeowner who has made timely payments under a TPP Agreement as delinquent, in violation of HAMP rules.

83.   A former employee has confirmed that BOA does not properly employ the "waterfall" formula mandated by HAMP.  In addition, at least one former employee recalls seeing homeowners' financial records manipulated in BOA's computer system to the homeowners' detriment.

84.   Despite the HAMP directives regarding the specific manner in which homeowners in the process of applying for a modification or in a Trial Period Plan are to be reported to credit reporting agencies, a former employee reports that BOA's practice is to report homeowners to credit reporting agencies as being delinquent without any further explanation thereby further damaging the homeowners' credit and therefore making alternative options to resolve delinquencies, such as refinancing, difficult or impossible.  Similarly, other forms of credit can and do become more expensive.

85.   Former BOA employees attest to seeing records regarding hundreds of homeowners in Trial Plans but recall none who had a trial plan properly converted to a permanent plan following three or even four successful payments.  According to the experience of one former employee, the vast majority of homeowners who seek a HAMP modification with BOA do not ever receive a permanently modified loan but are instead delayed indefinitely.

86.   Like many servicers, BOA has chosen not to comply with the obligations it undertook to participate in HAMP by entering into the SPA.  As a Congressional Oversight Panel recently found, the failure of servicers to follow through with HAMP's requirements has resulted in the program failing to help the vast majority of homeowners facing foreclosure. Congressional Oversight Panel, December 14, 2010 report at 4 (hereinafter

"COP Report").

87. Despite HAMP's straightforward premise of providing loan modifications to prevent foreclosures, its prohibitions against foreclosing on a homeowner in the midst of applying for a HAMP modification, and its requirement that all other foreclosure alternatives be exhausted as a prerequisite to foreclosure, the number of foreclosure completions has actually risen since the time HAMP went into effect and since Bank of America began participating. **Id. at 9.**

88. In evaluating HAMP to date, the Congressional Oversight Panel specifically found that its shortcomings were largely due to the role mortgage servicers such as BOA have played in the process and their interest in turning substantial profit from foreclosure related fees. The Panel found that the Treasury department has "failed to hold loan servicers accountable when they have repeatedly lost borrower paperwork or refused to perform loan modifications." **Id. at 5.** The Panel thus noted a "need for greater accountability in HAMP, particularly with regard to the activities of participating servicers." **Id. at 7.**

### BOA Routinely Breaches its TPP Agreements

89. Standing independent of BOA's failure to follow the rules of HAMP as promised in the SPA is BOA's routine breach of the form TPP Agreement.

90. Each and every named plaintiff in the TPP Class was determined by BOA to have met the threshold requirements for HAMP, as described above, prior to being tendered a TPP Agreement.

91. As described above, the form TPP Agreement contemplates a finite trial period, during which BOA is permitted to verify the information used to make the initial finding of eligibility and test the borrower's ability to make monthly payments at the modified level. Under the terms of the TPP Agreement, BOA is not entitled to an ongoing and open-ended period of time in which to review and re-review the borrower's eligibility.

92. The COP Report specifically cited Bank of America as having a markedly low rate of

converting TPP Agreements into permanent modifications. Whereas the top servicers had conversion rates of 89 and 95 percent, "Bank of America's rate is closer to 30 percent." **Id. at 21-22.** Bank of America, standing alone, accounts for more than half of the total backlog of all participating servicers in the number of trial modifications that they have failed to convert into permanent modifications.

93.   BOA understood that the TPP Agreement required it to tender permanent modifications to borrowers who successfully completed their three or four month trial period. BOA represents on its website, and in other standardized written and oral communications, that borrowers who successfully make the trial period payments will be given a permanent loan modification. The BOA website states, without qualification: "If you successfully make your Trial Period Plan payments during the trial period, you will be approved for a permanent modification of your loan." A separate page on Bank of America's website outlines the HAMP program as follows:

   • Step 1: If you meet the minimum eligibility requirements, call us to request a Home Affordable Modification. We'll review your situation, confirm that you meet the requirements for this program and then send you a financial information packet.

   • Step 2: Once you've received your packet, you'll need to fill-out the forms and collect your documents. Sign and return the information to us as soon as possible. We can't evaluate you for a trial modification without all of your required documentation.

   • Step 3: If you qualify for the program, you'll enter a trial period of at least 3 months. Making all of your payments during this trial period will demonstrate that you can afford the modified payments and that they work within your budget.

   • Step 4: If you successfully make all of your Trial Period Plan payments, you will receive a Modification Agreement defining the changes. After

this document has been signed, notarized and returned to us, your
modification will be officially made permanent.

94.   Nevertheless, BOA has routinely breached its obligations under the TPP Agreement by
failing either to tender HAMP-compliant modifications or denials to Plaintiffs prior to
the close of the trial period.

95.   This is unsurprising given the U.S. Treasury's reporting of BOA's overall performance
under HAMP. In November 2010, the U.S. Treasury reported that Bank of America
ranked third-worst of all servicers with a conversion rate of trial plans to permanent
modifications of just 29%. Worse still, the report indicates that Bank of America was the
single worst servicer in performing under HAMP when measured by the number of
customers who have not been tendered permanent modifications, despite their having
reached the end of their trial period. Bank of America has over four times as many of
these customers (19,795) as the next worst violator (JP Morgan Chase - 4642). The
Treasury Report is attached hereto as **Exhibit 7.**

96.   Further, Treasury specifically identified BOA as being in need of "substantial
improvement" in connection with the discharge of its obligations under HAMP in a
Servicer Performance Report analyzing activity through April 2011. A copy of this
report is attached as **Exhibit 8.** Among the many significant problems identified by
Treasury's audit was a finding that BOA miscalculated borrower income in mort than one
out of every five cases. **See Exhibit 8 at 19.** Due to its dismal results, the Treasury
Department decided at that time to begin withholding the servicer incentive payments
that are part of HAMP from BOA. **Id.**

97.   In order to perform under the terms of the TPP Agreement, BOA must tender a
permanent modification that complies with HAMP rules and Program Documentation by
the end of the trial period. If BOA believes, based on new and different information it
gathers from the homeowner during the trial period, that its initial determination of
eligibility was incorrect, it is obligated to notify the homeowner of that fact prior to the

end of the trial period.  If BOA fails to do so, it has breached the TPP Agreement and waived its ability to claim ineligibility or non- compliance in the future.

### BOA's Actions Caused Injury to Plaintiffs

98.   Plaintiffs have suffered injury caused by BOA's actions, including but not limited to longer loan payoff times, improper negative reporting to credit bureaus resulting in monetary harm due to damaged credit, monetary damages from higher principle balances, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest.  Further, in many instances, BOA actually encouraged or instructed borrowers to default on their loans in order to "qualify" for assistance, when in fact HAMP requires only that an "imminent risk of default" be attested to.

99.   Moreover, whenever BOA breaches the TPP Agreement and delays the tender of a permanent HAMP modification beyond the close of the trial period, the terms of such a modification are less beneficial to the homeowner than they otherwise would be had BOA properly performed.  If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their injury is measured by the difference between the modification they accepted and the modification they were entitled to.  If an eligible homeowner has not been tendered a permanent modification, their injury is measured by the difference between their current circumstances and the terms of the modification that they were entitled to - a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.

100.  BOA's behavior has also left class members in limbo, wondering if their home can be saved and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward trial period-level payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

## CLAIMS OF NAMED PLAINTIFFS

101.   Each of the named plaintiffs is the owner-occupant of a residential home encumbered by a first-lien loan of less than $729,750 that was originated prior to January 1, 2009, and that is serviced by BOA. The mortgage loans secured by each named plaintiff's home was either in default or was at imminent risk of default at the time each named plaintiff applied to BOA for a HAMP loan modification.

102.   Each of the named plaintiffs have received a form TPP agreement substantially similar to the example attached hereto as **Exhibit 6**, a copy of which is in BOA's possession, and which is incorporated herein by reference.

### *Dennis Ardine*

103.   BOA is the servicer of a loan made to Dennis Ardine (hereinafter "Ardine") in 2005 to purchase the property located at 6160 Shawnee Avenue, Las Vegas, Nevada 89107. The loan number for this property is 105375957.  Sometime after taking out the loan, Ardine began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

104.   After applying for a HAMP modification, Ardine was determined initially eligible by BOA and sent a TPP Agreement in June 2009 that is substantially identical to the form TPP Agreement described in the Factual Background section above.  Ardine accepted, executed and returned the TPP Agreement to BOA.

105.   Ardine's TPP Agreement described a trial period that was to run from July 2009 to September 2009. Ardine made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

106.   Since the TPP period began, and at all times relevant, Ardine has responded to all document requests made by BOA by timely supplying the requested documents. Ardine supplied information to BOA that was truthful to the best of his knowledge throughout the HAMP process.

107.   Ardine received neither the tender of a permanent loan modification that complied with

HAMP rules, nor notification that he was ineligible prior to the expiration of his trial period.

108.   During Ardine's trial period, BOA continued foreclosure proceedings against his home.

### Celsa Arenas

109.   BOA is the servicer of a loan made to Celsa Arenas (hereinafter "Arenas") in 2005 to purchase the property located at 1900 Hassett Avenue, Las Vegas, Nevada 89104. The loan number for this property is 22180393.  Sometime after taking out the loan, Arenas began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

110.   After applying for a HAMP modification, Arenas was determined initially eligible by BOA and sent a TPP Agreement in October 2009 that is substantially identical to the form TPP Agreement described in the Factual Background section above. Arenas accepted, executed and returned the TPP Agreement to BOA.

111.   Arenas's TPP Agreement described a trial period that was to run from November 2009 to January 2010. Arenas made each of the payments described in the TPP Agreement, which were accepted by BOA.

112.   Since the TPP period began, and at all times relevant, Arenas has responded to all document requests made by BOA by timely supplying the requested documents. Arenas supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

113.   Arenas received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible prior to the expiration of her trial period.

114.   During Arenas's trial period, BOA continued foreclosure proceedings against her home.

### Patrice Armbrister

115.   BOA is the servicer of a loan made to Patrice Armbrister (hereinafter "Armbrister") in 2007 to purchase the property located at 413 Mystic River Street, Henderson, Nevada

89015. The loan number for this property is 159468370. Sometime after taking out the loan, Armbrister began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

116. After applying for a HAMP modification, Armbrister was determined initially eligible by BOA and sent a TPP Agreement in September 2010 that is substantially identical to the form TPP Agreement described in the Factual Background section above. Armbrister accepted, executed and returned the TPP Agreement to BOA.

117. Armbrister's TPP Agreement described a trial period that was to run from October 2010 to December 2010. Armbrister made each of the payments described in the TPP Agreement, which were accepted by BOA.

118. Since the TPP period began, and at all times relevant, Armbrister has responded to all document requests made by BOA by timely supplying the requested documents. Armbrister supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

119. Armbrister received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible prior to the expiration of her trial period.

120. During Armbrister's trial period, BOA continued foreclosure proceedings against her home.

**_Robert Baker Jr._**

121. BOA is the servicer of a loan made to Robert Baker Jr. (hereinafter "Baker") in 2007 to purchase the property located at 7009 Rotunda Court, Las Vegas, Nevada 89130. The loan number for this property is 171580585. Sometime after taking out the loan, Baker began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

122. After applying for a HAMP modification, Baker was determined initially eligible by BOA and sent a TPP Agreement in or around July 2009 that is substantially identical to

the form TPP Agreement described in the Factual Background section above. Baker accepted, executed and returned the TPP Agreement to BOA.

123. Baker's TPP Agreement described a trial period that was to run from August 2009 to October 2009. Baker made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

124. Since the TPP period began, and at all times relevant, Baker has responded to all document requests made by BOA by timely supplying the requested documents. Baker supplied information to BOA that was truthful to the best of his knowledge throughout the HAMP process.

125. Baker received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible prior to the expiration of his trial period.

126. During Baker's trial period, BOA continued foreclosure proceedings against his home.

**_Leigh Blackwell & Thomas Crooks_**

127. BOA is the servicer of a loan made to Leigh Blackwell & Thomas Crooks (hereinafter "Blackwell & Crooks") in 2007 to purchase the property located at 1033 Via Panfilo Avenue, Henderson, Nevada 89011. The loan number for this property is 870653582. Sometime after taking out the loan, Blackwell & Crooks began experiencing hardships that caused them to have difficulty making monthly payments on their mortgage.

128. After applying for a HAMP modification, Blackwell & Crooks were determined initially eligible by BOA and sent a TPP Agreement in or around May 2010 that is substantially identical to the form TPP Agreement described in the Factual Background section above. Blackwell & Crooks accepted, executed and returned the TPP Agreement to BOA.

129. Upon information and belief, Blackwell & Crooks' TPP Agreement described a trial period that was to run from June 2010 through August 2010. Blackwell & Crooks made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

130. Since the TPP period began, and at all times relevant, Blackwell & Crooks have responded to all document requests made by BOA by timely supplying the requested documents. Blackwell & Crooks supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

131. Blackwell & Crooks received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible prior to the expiration of their trial period.

132. During Blackwell & Crooks' trial period, BOA continued foreclosure proceedings against their home.

### *Richard Bohlke*

133. BOA is the servicer of a loan made to Richard Bohlke (hereinafter "Bohlke") in 2005 to purchase the property located at 3159 Vistoso Circle, Henderson, Nevada 89014. The loan number for this property is 88535498.  Sometime after taking out the loan, Bohlke began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

134. After applying for a HAMP modification, Bohlke was determined initially eligible by BOA and sent a TPP Agreement in or around August 2010 that is substantially identical to the form TPP Agreement described in the Factual Background section above. Bohlke accepted, executed and returned the TPP Agreement to BOA.

135. Bohlke's TPP Agreement described a trial period that was to run from September 2010 to November 2010. Bohlke made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

136. Since the TPP period began, and at all times relevant, Bohlke has responded to all document requests made by BOA by timely supplying the requested documents. Bohlke supplied information to BOA that was truthful to the best of his knowledge throughout the HAMP process.

137. Bohlke received a permanent modification in December 2010, however, Bank of

America has not complied with the permanent modification.

138.   During Bohlke's trial period and permanent modification, BOA continued foreclosure proceedings against his home.

## Dave & Joan Cross

139.   BOA is the servicer of a loan made to Dave and Joan Cross (hereinafter "the Crosses") in 2005 to purchase the property located at 5212 Gentle River Avenue, Las Vegas, Nevada 89130. The loan number for this property is 872556857.  Sometime after taking out the loan, the Crosses began experiencing hardships that caused them to have difficulty making monthly payments on their mortgage.

140.   After applying for a HAMP modification, the Crosses were determined initially eligible by BOA and sent a TPP Agreement in December 2010 that is substantially identical to the form TPP Agreement described in the Factual Background section above. The Crosses accepted, executed and returned the TPP Agreement to BOA.

141.   The Crosses' TPP Agreement described a trial period that was to run from February 2011 through April 2011. The Crosses made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

142.   Since the TPP period began, and at all times relevant, the Crosses have responded to all document requests made by BOA by timely supplying the requested documents. The Crosses supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

143.   The Crosses received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible prior to the expiration of their trial period.

144.   During the Crosses' trial period, BOA continued foreclosure proceedings against their home.

/.../.../

*__Pamela Frickx__*

145. BOA is the servicer of a loan made to Pamela Frickx (hereinafter "Frickx") in 2005 to purchase the property located at 10388 Commanche Moon Avenue, Las Vegas, Nevada 89129. The loan number for this property is 94142585. Sometime after taking out the loan, Frickx began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

146. After applying for a HAMP modification, Frickx was determined initially eligible by BOA and sent a TPP Agreement in July 2009 that is substantially identical to the form TPP Agreement described in the Factual Background section above. Frickx accepted, executed and returned the TPP Agreement to BOA.

147. Frickx TPP Agreement described a trial period that was to run from August 2009 through October 2009. Frickx made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

148. Since the TPP period began, and at all times relevant, Frickx has responded to all document requests made by BOA by timely supplying the requested documents. Frickx supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

149. Frickx received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible prior to the expiration of her trial period.

150. During Frickx's trial period, BOA continued foreclosure proceedings against her home.

*__Leslie Humphrey & Mary Joe Stoglin__*

151. BOA is the servicer of a loan made to Leslie Humphrey and Mary Joe Stoglin (hereinafter "Humphrey and Stoglin") in 2007 to purchase the property located at 9345 Autumn View Avenue, Las Vegas, Nevada 89178. The loan number for this property is 6898086. Sometime after taking out the loan, Humphrey and Stoglin began experiencing hardships that caused them to have difficulty making monthly payments on their

mortgage.

152. After applying for a HAMP modification, Humphrey and Stoglin were determined initially eligible by BOA and sent a TPP Agreement in August 2009 that is substantially identical to the form TPP Agreement described in the Factual Background section above. Humphrey and Stoglin accepted, executed and returned the TPP Agreement to BOA.

153. Humphrey and Stoglin's TPP Agreement described a trial period that was to run from September 2009 through November 2009.Humphrey and Stoglin made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

154. Since the TPP period began, and at all times relevant, Humphrey and Stoglin have responded to all document requests made by BOA by timely supplying the requested documents. Humphrey and Stoglin supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

155. Humphrey and Stoglin received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible prior to the expiration of their trial period.

156. During Humphrey and Stoglin's trial period, BOA continued foreclosure proceedings against their home.

### *Mahvash & Mohamad Jahangiri*

157. BOA is the servicer of a loan made to Mahvash & Mohamad Jahangiri (hereinafter the "Jahangiris") in 2007 to purchase the property located at 2177 Mohawk Street, Las Vegas, Nevada 89146. The loan number for this property is 2132378103989146. Sometime after taking out the loan, the Jahangiris began experiencing hardships that caused them to have difficulty making monthly payments on their mortgage.

158. After applying for a HAMP modification, the Jahangiris were determined initially eligible by BOA and sent a TPP Agreement in November 2010 that is substantially identical to the form TPP Agreement described in the Factual Background section above.

The Jahangiris accepted, executed and returned the TPP Agreement to BOA.

159. The Jahangiris' TPP Agreement described a trial period that was to run from January 2011 through March 2011. The Jahangiris made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

160. Since the TPP period began, and at all times relevant, the Jahangiris have responded to all document requests made by BOA by timely supplying the requested documents. The Jahangiris supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

161. The Jahangiris received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that they were ineligible prior to the expiration of their trial period.

162. During the Jahangiris' trial period, BOA continued foreclosure proceedings against their home.

### *Robert Johnson*

163. BOA is the servicer of a loan made to Robert Johnson (hereinafter "Johnson") in 2007 to purchase the property located at 3912 Toulouse Court, North Las Vegas, Nevada 89031. The loan number for this property is 22270089. Sometime after taking out the loan, Johnson began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

164. After applying for a HAMP modification, Johnson was determined initially eligible by BOA and sent a TPP Agreement in October 2009 that is substantially identical to the form TPP Agreement described in the Factual Background section above. Johnson accepted, executed and returned the TPP Agreement to BOA.

165. Johnson's TPP Agreement described a trial period that was to run from November 2009 through January 2010. Johnson made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted

by BOA.

166.    Since the TPP period began, and at all times relevant, Johnson has responded to all document requests made by BOA by timely supplying the requested documents. Johnson supplied information to BOA that was truthful to the best of his knowledge throughout the HAMP process.

167.    Johnson received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible prior to the expiration of his trial period.

168.    During Johnson's trial period, BOA continued foreclosure proceedings against his home.

### *James & Loretta Kirkpatrick*

169.    BOA is the servicer of a loan made to James & Loretta Kirkpatrick (hereinafter the "Kirkpatricks") in 2006 to purchase the property located at 3805 Maurice Court, Las Vegas, Nevada 89108. The loan number for this property is 142656362.  Sometime after taking out the loan, the Kirkpatricks began experiencing hardships that caused them to have difficulty making monthly payments on their mortgage.

170.    After applying for a HAMP modification, the Kirkpatricks were determined initially eligible by BOA and sent a TPP Agreement in April 2010 that is substantially identical to the form TPP Agreement described in the Factual Background section above. The Kirkpatricks accepted, executed and returned the TPP Agreement to BOA.

171.    The Kirkpatricks' TPP Agreement described a trial period that was to run from May 2010 through July 2010. The Kirkpatricks made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

172.    Since the TPP period began, and at all times relevant, the Kirkpatricks have responded to all document requests made by BOA by timely supplying the requested documents. The Kirkpatricks supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

173.   The Kirkpatricks received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that they were ineligible prior to the expiration of their trial period.

174.   During the Kirkpatricks' trial period, BOA continued foreclosure proceedings against their home.

**_Leonard Pascual_**

175.   BOA is the servicer of a loan made to Leonard Pascual (hereinafter "Pascual") in 2004 to purchase the property located at 4171 Mita Way, Las Vegas, Nevada 89141. The loan number for this property is 69949408.  Sometime after taking out the loan, Pascual began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

176.   After applying for a HAMP modification, Pascual was determined initially eligible by BOA and sent a TPP Agreement in August 2009 that is substantially identical to the form TPP Agreement described in the Factual Background section above. Pascual accepted, executed and returned the TPP Agreement to BOA.

177.   Pascual's TPP Agreement described a trial period that was to run from September 2009 through January 2010. Pascual made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

178.   Since the TPP period began, and at all times relevant, Pascual has responded to all document requests made by BOA by timely supplying the requested documents. Pascual supplied information to BOA that was truthful to the best of his knowledge throughout the HAMP process.

179.   Pascual received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible prior to the expiration of his trial period.

180.   During Pascual's trial period, BOA continued foreclosure proceedings against his home.

*Larae Rollyson*

181.  BOA is the servicer of a loan made to Larae Rollyson (hereinafter "Rollyson") in 2007 to purchase the property located at 3601 Spanish Butterfly Street #103, Las Vegas, Nevada 89108. The loan number for this property is 158591549. Sometime after taking out the loan, Rollyson began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

182.  After applying for a HAMP modification, Rollyson was determined initially eligible by BOA and sent a TPP Agreement in March 2010 that is substantially identical to the form TPP Agreement described in the Factual Background section above. Rollyson accepted, executed and returned the TPP Agreement to BOA.

183.  Rollyson's TPP Agreement described a trial period that was to run from April 2010 through July 2010. Rollyson made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

184.  Since the TPP period began, and at all times relevant, Rollyson has responded to all document requests made by BOA by timely supplying the requested documents. Rollyson supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

185.  Rollyson received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible prior to the expiration of her trial period.

186.  During Rollyson's trial period, BOA continued foreclosure proceedings against her home.

*Richard & Sylvia Sheler*

187.  BOA is the servicer of a loan made to Richard and Sylvia Sheler (hereinafter "the Shelers") in 2007 to purchase the property located at 3601 Cottage Wood Street, Laughlin, Nevada 89029. The loan number for this property is 162959053. Sometime

after taking out the loan, the Shelers began experiencing hardships that caused them to have difficulty making monthly payments on their mortgage.

188. After applying for a HAMP modification, the Shelers were determined initially eligible by BOA and sent a TPP Agreement in August 2009 that is substantially identical to the form TPP Agreement described in the Factual Background section above. The Shelers accepted, executed and returned the TPP Agreement to BOA.

189. The Shelers' TPP Agreement described a trial period that was to run from September 2009 through November 2009. The Shelers made each of the payments described in the TPP Agreement, which were accepted by BOA.

190. Since the TPP period began, and at all times relevant, the Shelers have responded to all document requests made by BOA by timely supplying the requested documents. The Shelers supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

191. The Shelers received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible prior to the expiration of their trial period.

192. During the Shelers' trial period, BOA continued foreclosure proceedings against their home.

### Joseph Verona

193. BOA is the servicer of a loan made to Joseph Verona (hereinafter "Verona") in 2006 to purchase the property located at 1617 Rising Pebble Court, North Las Vegas, Nevada 89031. The loan number for this property is 118316985. Sometime after taking out the loan, Verona began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

194. After applying for a HAMP modification, Verona was determined initially eligible by BOA and sent a TPP Agreement in or about December 2009 that is substantially identical to the form TPP Agreement described in the Factual Background section above. Verona

accepted, executed and returned the TPP Agreement to BOA.

195. Verona's TPP Agreement described a trial period that was to run from February 2010 through April 2010. Verona made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

196. Since the TPP period began, and at all times relevant, Verona has responded to all document requests made by BOA by timely supplying the requested documents. Verona supplied information to BOA that was truthful to the best of his knowledge throughout the HAMP process.

197. Verona received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible prior to the expiration of his trial period.

198. During Verona's trial period, BOA continued foreclosure proceedings against his home.

## CLASS ACTION ALLEGATIONS

### *Trial Period Plan ("TPP") Class*

199. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

200. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on their own behalf and on the behalf of all other members of the classes described below.

201. Plaintiffs seek certification of a class of individuals in the State of Nevada whose home mortgage loans have been serviced by BOA and who, since April 13, 2009, have entered into a TPP Agreement with BOA and made all payments required by their TPP Agreement, other than borrowers to whom BOA timely tendered either:

    a.    A Home Affordable Modification Agreement that complied with HAMP rules; or

    b.    A timely written denial of eligibility.

202. Excluded from the TPP Class and are governmental entities, Defendants, their affiliates and subsidiaries, BOA's current employees and current or former officers, directors,

agents, representatives, their family members, the members of this Court and its staff.

203. The TPP Class also includes individuals who received a permanent loan modification that was not compliant with HAMP rules and/or a permanent loan modification that BOA later repudiated.

204. The Named Plaintiffs in the TPP Class sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

205. Plaintiffs do not know the exact size or identities of the TPP Class, since such information is in the exclusive control of Defendant. Plaintiffs believe that the TPP Class encompasses many thousands of individuals and whose identities can be readily ascertained from Defendants' books and records. Therefore, the TPP Class is so numerous that joinder of all members is impracticable.

206. All members of the TPP Class have been subject to and affected by the same conduct. The claims are based on standard form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the TPP Class, and predominate over any questions affecting only individual members of the class. These questions include, but are not limited to the following:

    a. the nature, scope and operation of Defendant's obligations to homeowners under HAMP;

    b. whether Defendants' receipt of an executed TPP Agreement, along with supporting documentation and three monthly payments, creates a binding contract or otherwise legally obligates Defendants to offer class members a permanent HAMP modification;

    c. whether Defendants' failure to provide permanent HAMP modifications in the circumstances described herein amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing;

    d. whether Defendants' conduct violates applicable state consumer protection laws and corresponding regulations; and

e.   whether the Court can order damages and enter injunctive relief.

207.   The claims of the TPP Class Named Plaintiffs are typical of the claims of the TPP Class and do not conflict with the interests of any other members of the class in that both the Named Plaintiffs and the other members of the class were subject to the same conduct, signed the same agreement and were met with the same absence of a permanent modification.

208.   The named Plaintiffs will fairly and adequately represent the interests of the TPP Class. They are committed to the vigorous prosecution of the class claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions - in particular, consumer protection actions.

209.   A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

210.   This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

211.   BOA has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## FIRST CAUSE OF ACTION
*Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing for Violations of Law arising from TPP Agreements*

212.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

213.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the TPP Class described above.

214.   As described above, the standard TPP Agreements sent by BOA to each Plaintiff constitutes a valid offer.

215.   By executing the TPP Agreements and returning them to BOA along with the supporting documentation, Plaintiffs accepted BOA's offers.

216.  Alternatively, Plaintiffs' return of the TPP Agreements constitutes an offer. Acceptance of these offers occurred when BOA accepted Plaintiffs' TPP payments.

217.  The TPP Agreements were supported by consideration. First, Plaintiffs' TPP payments to BOA constitute consideration. By making those payments, Plaintiffs gave up the ability to pursue other means of saving their home. Further, the TPP Agreement requires homeowners to undertake several duties that they are not otherwise obligated to undertake. Section 1 of the TPP Agreement required the homeowner to agree to undergo credit counseling, if they were asked to do so. In addition, the TPP Agreement required homeowners to submit financial documentation that they were not otherwise required to provide, to set up newly established escrow accounts, and to make legally binding representations about their personal circumstances. These actions constitute both a detriment to the Plaintiffs and a benefit to BOA.

218.  Plaintiffs and BOA thereby formed valid contracts.

219.  To the extent that the contract was subject to a condition subsequent by providing BOA an opportunity to review the documentation submitted by Plaintiffs when they returned the signed TPP Agreements, to determine its sufficiency, this condition was waived by BOA in that it failed to timely raise it and/or it is estopped to assert it as a defense to Plaintiffs' claims.

220.  By failing to offer Plaintiffs permanent HAMP modifications, BOA breached those contracts.

221.  Plaintiffs remain ready, willing and able to perform under the contracts.

222.  Plaintiffs have suffered harm and are threatened with additional harm from BOA's breach, including but not limited to longer loan payoff times, higher principle balances, improper negative reporting to credit bureaus; inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest. If a class member has accepted a modification on terms

that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their injury is measured by the difference between the modification they accepted and the modification they were entitled to. If an eligible homeowner has not been tendered a permanent modification, their injury is measured by the difference between their current circumstances and the terms of the modification that they were entitled to - a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.

223. By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their home, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home. Some putative class members have suffered additional harm in the form of foreclosure activity against their homes.

224. BOA is obligated by contract and common law to act in good faith and to deal fairly with each borrower so as to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.

225. BOA routinely and regularly acts in bad faith and breaches this duty for its own economic benefit by:

    a.    Failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs and members of the class;

    b.    Failing to properly train and supervise its agents and employees, including without limitation, its loss mitigation and collection personnel, foreclosure personnel, and personnel implementing its modification programs;

    c.    Failing to permanently modify loans and/or provide alternatives to foreclosure and using unfair means to keep Plaintiffs and the class in trial periods of indeterminate lengths, including, without limitation, routinely demanding information it already possesses and failing to communicate accurately or consistently with borrowers about the status of their loan

modification applications;

    d.    Making inaccurate calculations and determinations of Plaintiffs' eligibility for permanent modifications;

    e.    Encouraging and/or allowing its employees and agents to make inaccurate statements regarding Plaintiffs' and class members' eligibility for permanent loan modifications under HAMP;

    f.    Failing to follow through on written and implied promises;

    g.    Failing to follow through on contractual obligations; and

    h.    Failing to give permanent HAMP modifications and other foreclosure alternatives to qualified borrowers.

226.    As a result of these failures to act in good faith and the absence of fair dealing, BOA caused Plaintiffs harm, as alleged above. BOAs' bad faith was thus to Plaintiffs' detriment.

227.    That as a result of Defendant's actions, Plaintiffs have been damaged in excess of $10,000.00.

## SECOND CAUSE OF ACTION
### *Promissory Estoppel, in the alternative*

228.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full

229.    The TPP Class Plaintiffs bring this claim on their own behalf and on behalf of each member of the TPP Class described above.

230.    BOA, by way of its TPP Agreements, made representations to Plaintiffs that if they returned the TPP Agreements executed and with supporting documentation, and made their TPP payments, they would receive permanent HAMP modifications.

231.    BOA's TPP Agreements were intended to induce Plaintiffs to rely on them and make monthly TPP payments.

232.    Plaintiffs did indeed rely on BOA's representation, by submitting TPP payments.

233.    Given the language in the TPP Agreement, Plaintiffs' reliance was reasonable.

234.   Plaintiffs' reliance was to their detriment.  If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their detrimental reliance is measured by the difference between the modification they accepted and the modification they were entitled to.  If an eligible homeowner has not been tendered a permanent modification, their detrimental reliance is measured by the difference between their current circumstances and the terms of the modification that they were entitled to - a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.  Such detriment includes longer loan payoff times, higher principle balances, improper negative reporting to credit bureaus; inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest. Further, Plaintiffs have lost the opportunity to fund other strategies to deal with their default and to avoid foreclosure.

235.   That as a result of Defendant's actions, Plaintiffs have been damaged in excess of $10,000.00.

### THIRD CAUSE OF ACTION
*Violations of the Nevada Deceptive Trade Practices Act*

236.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

237.   Bank of America's misrepresentations to Plaintiffs, and in fact, Nevada consumers as a whole, regarding the operation of its mortgage modification practice violates the Nevada Deceptive Practices Act.

238.   In particular Bank of America's deceptive conduct breached its obligations under:

   a.   Nev. Rev. Stat. § 598.0915(9), which provides that it is a deceptive practice for a person to "[a]dvertise[] goods or services with the intent not to sell or lease them as advertised;"

   b.   Nev. Rev. Stat. § 598.0915(15),  making it a deceptive trade practice for a person

to "[k]nowingly make[] any other false representation in a transaction;"

    c.    Nev. Rev. Stat. § 598.092(8), which declares that it is a deceptive trade practice for a person to "[k]nowingly misrepresent[] the legal rights, obligations, or remedies of a party to a transaction;" and

    d.    Nev. Rev. Stat. § 598.0973, allowing a court to impose heightened penalties for "engage[ing] in a deceptive trade practice directed toward an elderly person or a person with a disability."

239. As alleged herein, Bank of America engaged in unlawful practices in violation of the Nevada Deceptive Trade Practices Act §§ 598, *et seq.*, in that it made false promises and used deception, deceptive practices, and/or misrepresentations in connection with mortgage modifications.

240. That as a result of Defendant's actions, Plaintiffs have been damaged in excess of $10,000.00.

241. In all matters alleged herein, the Defendants acted willfully in violation of Nev. Rev. Stat. §§ 598, *et seq.*, as required by Nev. Rev. Stat. § 598.0999(2).

242. As such, Plaintiffs are entitled to recover punitive damages in an amount to be determined at trial.

243. The Plaintiffs have been required to retain the services of Callister + Associates to prosecute this action, and Plaintiffs are therefore entitled to recover their reasonable attorney's fees and costs of court for having to bring this action.

/.../.../

/.../.../

/.../.../

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.    Enter a judgment declaring the acts and practices of BOA complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to class members on the terms promised in class members' temporary modifications, together with an award of monetary damages and other available relief on those claims;

b.    Enter a judgment declaring that the Defendant's operation of its loan modification program has violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598, *et seq.*;

c.    Grant a permanent or final injunction enjoining BOA's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

d.    Order BOA to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e.    Order specific performance of BOA's contractual obligations together with other relief required by contract and law;

f.    Award actual, exemplary and/or statutory minimum damages pursuant to Plaintiffs' Third Cause of Action;

g.    Award restitution and prejudgment interest;

h.    Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

/.../.../

/.../.../

/.../.../

i.   Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

DATED: This *2nd* day of September, 2011.

Respectfully submitted,

**CALLISTER + ASSOCIATES, LLC**

By:_____
**MATTHEW Q. CALLISTER, ESQ.**
Nevada Bar No. 001396
823 Las Vegas Blvd. South, 5th Floor
Las Vegas, NV 89101
*Attorneys for Plaintiffs*